## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

————————————————————————

DEANNA BERKEMEIER,        )

       )      Case No. 25-cv-06003

      Plaintiff,   )

       )

   - v. -       )      **COMPLAINT**

       )

GENESEE COUNTRY MUSEUM d/b/a,   )      JURY TRIAL DEMANDED

GENESEE COUNTRY VILLAGE & MUSEUM,   )

and ELIZABETH WEHLE, individually and in her )

official capacity as President and Chief Executive )

Officer of the Genesee Country Museum,   )

       )

      Defendants.   )

————————————————————————

For her COMPLAINT against Defendants GENESEE COUNTRY MUSEUM d/b/a GENESEE COUNTRY VILLAGE & MUSEUM and ELIZABETH WEHLE, individually and in her official capacity as President and Chief Executive Officer of the Genesee Country Museum, Plaintiff DEANNA BERKEMEIER alleges and avers as follows:

### <u>INTRODUCTION</u>

1.     Deanna Berkemeier, the Plaintiff herein, was employed by the Genesee Country Village & Museum for more than two decades until her abrupt and unlawful termination in August 2022. Mrs. Berkemeier's termination is attributable entirely to the ideological shift taking place at the Museum at the behest of its President and Chief Executive Officer, Elizabeth ("Becky") Wehle, who is also sued herein. Defendants targeted Mrs. Berkemeier for termination on account of her sincerely held religious beliefs, her commitment to her faith, and her identity as a Christian, and well as other immutable characteristics including her race, color, and age. Mrs. Berkemeier brings this action to redress violations of her civil and constitutional rights including those enshrined in

the First and Fourteenth Amendments to the United States Constitution and Title VII of the Civil Rights Act of 1964.

2.      As also alleged herein, to the extent Defendants will assert as a defense that their actions were compelled or justified by the New York State Human Rights Law (N.Y. Exec. Law §296 *et seq.*) as amended by the Gender Expression Non-Discrimination Act ("GENDA"), by this Complaint Plaintiff challenges the constitutionality of that Act.

<u>**PARTIES**</u>

3.      Plaintiff DEANNA BERKEMEIER ("Mrs. Berkemeier") is a 64-year-old grandmother, historian, and former employee of the GENESEE COUNTRY VILLAGE & MUSEUM. Mrs. Berkemeier is white and Christian. Mrs. Berkemeier is a resident of the County of Wyoming, State of New York.

4.      Defendant GENESEE COUNTRY MUSEUM ("the Museum") conducts business and holds itself out at GENESEE COUNTRY VILLAGE & MUSEUM. The Museum is a division of the State University of New York, having been created by and existing pursuant to charter issued by the Board of Regents of the State University of New York Education Department provisionally in 1966 and then permanently (by "Absolute Charter") in 1969. As such, the Museum is properly regarded as a state actor. The Museum is located in the County of Monroe, State of New York.

5.      Defendant ELIZABETH WEHLE (hereinafter referred to as "Ms. Wehle") is, and at all relevant times was, the President and Chief Executive Officer of the Museum. Upon information and belief, Ms. Wehle resides in the County of Monroe, State of New York. Ms. Wehle is sued herein in her individual and official capacities.

## JURISDICTION AND VENUE

6.      This action arises under 42 U.S.C. §1983, the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e, *et seq.*), the Age Discrimination in Employment Act (29 U.S.C. §623), and the New York State Human Rights Law, N.Y. Exec. Law §296(1).

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because this action arises in the district in which all defendants reside and this is the district in which a substantial part of the events and omissions giving rise to the claim occurred.

9.      This Court has the authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure, and the requested injunctive relief under 28 U.S.C. § 2202 and Rule 65, Federal Rules of Civil Procedure.

10.      The Court has authority to grant Plaintiff's request for damages under Title VII of the Civil Rights Act, 42 U.S.C. §2000e-5.

11.      This Court has the authority to award the requested costs and attorney's fees under 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

12.      Mrs. Berkemeier began her employment with the Museum in 1999 as a historical interpreter. In her role as a historical interpreter, Mrs. Berkemeier actively and accurately interpreted historical events, people, and groups including indigenous history, women's rights and suffrage, and the abolitionist movement.

3

13.     At the time of her termination in 2022, Mrs. Berkemeier had attained the position of manager of domestic manufacturers and historic culinary arts. Her job duties included interviewing and hiring staff for the segments of the Museum she managed; overseeing the historic kitchens and supervising kitchen assistants; research and dissemination of 19th century local, culinary, and material culture topics; menu planning; training and supervising employees in various other buildings/areas including religious buildings, 19th century herbal medicine, quilting, natural dyeing, and broom making. In addition, Mrs. Berkemeier was responsible for various aspects of the Museum's social media, worked with other staff in event and theme planning, coordinated monthly weekend pioneer experiences, and led the planning and execution of an annual international symposium. Mrs. Berkemeier also managed the historic confectionary, did cost accounting and price-setting, prepared interdepartmental transfers, and ensured that all of the buildings and costumed staff under her supervision were portrayed and dressed historically accurately.

14.     Mrs. Berkemeier maintained good relationships with all of her coworkers and had an optimal experience working at the Museum during the vast majority of her long tenure there.

15.     However, a shift occurred beginning in or around 2020, which intensified in 2022, that resulted in Mrs. Berkemeier feeling increasingly ostracized and out of place in what had been her place of employment for more than two decades.

16.     Mrs. Berkemeier served on a programming team for the initial Diversity, Equity, Acceptance, and Inclusion ("DEAI") planning in early 2020. While serving on that committee, she learned of the new philosophy being implemented by Ms. Wehle. Mrs. Berkemeier began to grow concerned about the incompatibility of the new direction Ms. Wehle intended to take the Museum in with Mrs. Berkemeier's own sincerely held religious beliefs.

17.    The onslaught of COVID-19 interrupted the planning, development, and implementation of the Museum's DEAI initiative. The Museum closed in March 2020 and reopened in July 2020.

18.    In April 2021, a newly-hired Christian employee was attending staff orientation. He approached Mrs. Berkemeier and told her that he found some of the subject matter of the training objectionable and contrary to his sincerely held Christian beliefs. Specifically, the trainers were telling the new employees that white people are born oppressors and people of color are inherently oppressed people based upon their skin color. The new hire went on to state to Mrs. Berkemeier that if he was forced to adhere to and espouse these beliefs in order to work at the Museum, he could not continue to work there because that would cause him to violate his own sincerely held religious beliefs and conscience because he believes that God created all people in His image and likeness and, therefore, skin color does not impact one's nature.

19.    Mrs. Berkemeier informed this new employee that she did not have authority over such matters, but suggested that he compose and send an email to Ms. Wehle regarding his concerns.

20.    The new employee heeded Mrs. Berkemeier's advice and sent an email to Ms. Wehle expressing his sincerely held religious objections to the ideology and worldview the Museum unabashedly sought to impose upon its new employees.

21.    Mrs. Berkemeier and her immediate supervisor were copied on the email.

22.    In response to the email, Mrs. Berkemeier's supervisor wrote and Ms. Wehle agreed (in sum and substance) that this new employee's views and beliefs are not in line with the philosophy of the Museum, and therefore he would not be a suitable employee.

23.    Mrs. Berkemeier was disturbed upon reading this email exchange because she shares the sincerely held religious beliefs and worldview of the employee Ms. Wehle deemed unsuitable for employment at the Museum.

24.    Mrs. Berkemeier immediately went into her supervisor's office and shared her concerns recounted above with him. The supervisor responded to Mrs. Berkemeier by stating (in sum and substance), "It's ok because I know you and you are not a racist."

25.    Mrs. Berkemeier agreed that she is not racist, but none of the comments of the new employee evinced that he was racist either. He merely expressed a sincerely held religious belief and conviction, which Mrs. Berkemeier shares, that God created all human beings and thus all human beings are vested with inherent and equal dignity and worth, irrespective of skin color.

26.    Another incident occurred in or around May 2021. Upon learning that the Museum had plans to celebrate Pride month on social media, Mrs. Berkemeier sought a religious accommodation exempting her from having to post on behalf of the Museum regarding these celebrations (posting notable Museum events on social media was among the duties of Mrs. Berkemeier's employment). This accommodation request was rooted in Mrs. Berkemeier's sincerely held religious beliefs that homosexuality is a sin and sin is something to seek repentance from, not to celebrate. No formal response was provided by the Museum to Mrs. Berkemeier's accommodation request.

27.    In or around February 2022, Mrs. Berkemeier was formally "counseled" by Ms. Wehle based upon false allegations of "bullying." Mrs. Berkemeier believes this marked the beginning of the course of conduct by Ms. Wehle and the Museum aimed at setting Mrs. Berkemeier up for termination on the basis of her religious beliefs, expression, and practice.

28.     In or around March 25, 2022, Ms. Wehle and the Museum retained a consultant to aid in implementing sweeping changes at the Museum centered upon the DEAI initiative. These sweeping changes included a radical overhaul of Museum staff and removing all "legacy staff" who were unwilling to violate their conscience or acquiesce to the narratives Ms. Wehle intended for the Museum to adopt and convey through its exhibits, programs, and events.

29.     On March 30, 2022, Mrs. Berkemeier participated in a mandatory training for all Museum employees. Towards the end of the training, Ms. Wehle asked the instructor (a transgender woman named "V")  (in sum and substance), "What is the best way for me to deal with people who do not agree with the changes I am making to the Museum to tell stories of 19th century LGBTQAI+ contributions to history and stories of more diverse people?" Ms. Wehle further stated (in sum and substance), "I would just like to tell those people that object to my approach to leave."

30.     This caused Mrs. Berkemeier to feel alarmed that she would be pinpointed and targeted for termination based upon her sincerely held religious beliefs and convictions, and it caused her to feel ostracized at work.

31.     In or around Spring/Summer 2022, Ms. Berkemeier was informed by her supervisor that Ms. Wehle directed that jobs remain posted even after they were filled in hopes of drawing applicants of "diverse" backgrounds. She further directed that only "diverse" applicants be considered.

32.     Ms. Wehle also expressed a preference for young employees and applicants.

33.     In June and July 2022, a series of trainings were held by the Museum to indoctrinate employees into believing that America's founding and founders were racist, that systemic racism permeates our government and society, and other like subjects.

34.     At these trainings, Ms. Wehle informed all Museum staff, including Mrs. Berkemeier, that the Museum will adopt and convey these narratives through its exhibits and events.

35.     Also at the trainings, Ms. Wehle reiterated her disdain for and intent to rid the Museum of employees who did not subscribe to this manner of thinking.

36.     During the trainings and specifically after Ms. Wehle made these comments, some employees were talking amongst themselves regarding their disagreement with the direction in which the Museum was headed. One employee loudly remarked, "Bull," in response to one statement the trainer made.

37.     Upon information and belief, the trainer reported these occurrences to Ms. Wehle.

38.     An investigation – or inquisition – ensued for the purpose of identifying which employees were involved in the dissension.

39.     To this end, a representative from the Museum's human resources department and a private consultant hired by the Museum met with and interviewed various Museum employees.

40.     On or about July 14, 2022, Mrs. Berkemeier was summoned to meet with the consultant. The consultant asked Mrs. Berkemeier a variety of questions including who else in her department would be able to perform Mrs. Berkemeier's job duties in her absence. The consultant sought detailed information, having Mrs. Berkemeier identify each of her job duties individually and which of her respective co-workers could perform which of those duties. This understandably made Mrs. Berkemeier feel that her continued employment with the Museum was in jeopardy.

41.     On August 9, 2022, Mrs. Berkemeier was informed by her immediate supervisor that Ms. Wehle and the human resources representative had asked to meet with Mrs. Berkemeier the following day.

42.     Mrs. Berkemeier already had approved leave that day (August 10) to drive her daughter to the airport and to work from home for the balance of the day. She was informed that the meeting day was non-negotiable and could not be delayed.

43.     On Wednesday, August 10, 2022, at 1:00 p.m., Mrs. Berkemeier met with Ms. Wehle and human resources representative Lindsay Fleming-Stumpf. Ms. Wehle initiated the meeting by advising Mrs. Berkemeier that the meeting was requested in furtherance of their investigation into comments that had been reported to them.

44.     Ms. Wehle asked Mrs. Berkemeier if she felt the workplace atmosphere is informal and if she engages in joking and friendly conversations with her co-workers. Mrs. Berkemeier responded that she is not really aware of the side conversations that occur in the workplace because she suffers from hearing loss and her difficulty hearing others was further exacerbated by the mask wearing required by the Museum during the COVID-19 pandemic.

45.     Ms. Wehle next asked Mrs. Berkemeier if she recalled any office discussions about race. Mrs. Berkemeier responded truthfully that she did not.

46.     Ms. Wehle followed up by asking Mrs. Berkemeier if she recalled stating to a coworker that she believes all people are of one race. Mrs. Berkemeier explained that she does indeed believe that and may have stated that. Mrs. Berkemeier provided further explanation, informing Ms. Wehle that her sincerely held religious beliefs and convictions are the origin of that belief and that the Bible teaches that God created the entire human race and all people are descendants of Adam and Eve.

47.     Ms. Wehle then asked Mrs. Berkemeier (in sum and substance), "What if they don't want to be? What if they want to be different?" Mrs. Berkemeier again responded truthfully that she respects and celebrates the cultural differences in people and people groups, but that her

sincerely held religious convictions compel her to believe that cultural differences do not negate the truth that all people and groups belong to the human race, created by God and descended from Adam, and that all humans are of equal value and importance.

48.    Ms. Wehle next asked Mrs. Berkemeier if she recalled stating to her co-worker, Anneliese, that she did not see a difference between their respective skin colors. Mrs. Berkemeier answered in the affirmative and stated that she does not see a difference between her skin color and Anneliese's. Anneliese is Chinese-American. Mrs. Berkemeier added additional information about the context of the conversation, explaining that Anneliese is her friend and Mrs. Berkemeier was consoling her after Anneliese shared with Mrs. Berkemeier that in the past someone had refused to work with her due to her skin color.

49.    Ms. Wehle scolded Mrs. Berkemeier for this statement, contending that it was "ridiculous" for Mrs. Berkemeier to make such statement. Ms. Wehle told Mrs. Berkemeier that her skin color is obviously different from Anneliese's and from Cheyney's as well.

50.    Cheyney is an African-American woman who led trainings at the Museum periodically, including the July training referenced above. Mrs. Berkemeier did not understand why Ms. Wehle introduced Cheyney's name into the conversation.

51.    It was evident to Mrs. Berkemeier that Ms. Wehle was angered by her responses and that her best chance at saving her employment would be to falsely concede that she made those statements in error and profess agreement with Ms. Wehle's worldview. However, Mrs. Berkemeier could not have done that without violating her own sincerely held religious beliefs and her conscience, so she decided against taking that approach.

52.    Instead, Mrs. Berkemeier, led by the Holy Spirit, responded thusly (in sum and substance): "Of course I see a difference; Cheyney's skin is much darker than mine. But, we are

all shades of brown if you compare our skin color to a white sheet of paper.[1] As I said earlier, I respect and celebrate the cultural differences in people and people groups, including the African-American culture and Chinese-American culture, but all people groups belong to the human race, are all equally valuable, and all descended from Adam and created by God."

53.    Mrs. Berkemeier added that although she did not believe Anneliese was at all hurt or offended by her remark, she would be happy to apologize and explain directly to Anneliese if Anneliese was hurt because Mrs. Berkemeier cares for Anneliese and would not want to cause her negative feelings. Ms. Wehle directed Mrs. Berkemeier not to apologize, and said (in sum and substance), "That is not what this is about."

54.    Ms. Wehle continued to contend that people are different based on their differing skin colors, to which Mrs. Berkemeier responded that she does not focus on skin color or differences but rather on our common attributes as human beings created by God. Mrs. Berkemeier's expression of her sincerely held religious beliefs and convictions visibly angered Ms. Wehle.

55.    Ms. Wehle also asked Mrs. Berkemeier about an occasion in which she told a Filipino co-worker that she would not have known said employee was Filipino had she not told her, implying that Mrs. Berkemeier was wrong to make such a comment. Ms. Berkemeier explained that she said that because she did not notice the employee's race. Mrs. Berkemeier reiterated that, based on her sincerely held religious beliefs and convictions, she does not view people based upon their race or color, which further irritated Ms. Wehle.

---

[1] This comment was inspired by a well-known work of art called Humanae by Brazilian artist Angelica Dass. The piece displays photos of all skin pigments of the world and demonstrates that, in fact, we are all shades of brown.

56.     Eventually, Ms. Wehle moved on to a new topic of interrogation and accused Mrs. Berkemeier of using "incorrect pronouns."

57.     Although Ms. Wehle did not identify the person who made this accusation, there was only one Museum employee during the period of Mrs. Berkemeier's employ that openly preferred to be referred to by a pronoun that is inconsistent with his/her biological sex. Thus, Mrs. Berkemeier correctly concluded that this particular co-worker, who went by the name "July," was the subject of this accusation.

58.     Mrs. Berkemeier told Ms. Wehle that she and July do not work in the same area so do not have much interaction. She further explained that when she does address July, she addresses July by her name.

59.     The human resources representative told Mrs. Berkemeier that the law of the State of New York requires her to address all persons by their desired pronouns.

60.     To that, Mrs. Berkemeier responded that the representative's understanding of New York law differed from her own understanding of the law. She nevertheless articulated that even if calling someone by their chosen (or given) name was somehow a violation of New York law, Mrs. Berkemeier was bound by her sincerely held religious convictions to obey a higher law – God's law. Mrs. Berkemeier further explained that the Bible clearly states that God created male and female, and that God does not make mistakes in his perfect design and creation. Mrs. Berkemeier articulated her sincerely held religious beliefs that to call a male by a female pronoun or vice versa would effectively be denying this Biblical truth, which she could not do without violating her sincerely held religious beliefs and her conscience.

61.    The human resources representative then asked Mrs. Berkemeier if she would "let" an "LGBTQ person" be assigned to a building that she oversaw. Mrs. Berkemeier simply responded, "Yes."

62.    Ms. Wehle then stated that it had been reported to her that Mrs. Berkemeier refused to allow "LGBTQ persons" in the buildings she oversaw. Mrs. Berkemeier denies this entirely and believes this allegation is fabricated. Mrs. Berkemeier informed Ms. Wehle that she is generally not aware of the sexual preferences of her co-workers. Again, Ms. Wehle became visibly perturbed.

63.    Mrs. Berkemeier was then asked by Ms. Wehle if she believes homosexuality is a sickness. Mrs. Berkemeier responded that she would not characterize it that way, but was not given the opportunity to provide further explanation as by that late-stage of the interview, the questions were being posed in rapid succession.

64.    Ms. Wehle told Mrs. Berkemeier that the Museum was going to continue its investigation and instructed Mrs. Berkemeier to go home immediately and not return to the property or speak to any Museum employee while the investigation is pending.

65.    Mrs. Berkemeier followed Ms. Wehle's instructions.

66.    A couple of weeks later, Ms. Wehle sent an email to Mrs. Berkemeier directing her to attend a meeting scheduled for August 30, 2022, at 10:30 a.m. at which Ms. Wehle, the human resources representative, and Mrs. Berkemeier's supervisor would be in attendance.

67.    Mrs. Berkemeier attended the meeting as directed. In the meeting, Ms. Wehle informed Mrs. Berkemeier that she had decided it was time for the Museum and Mrs. Berkemeier to "part ways."

68.    Mrs. Berkemeier asked Ms. Wehle why she was being fired, to which Ms. Wehle responded (in sum and substance), "For the reasons discussed in our August 10th meeting."

69.    Mrs. Berkemeier was terminated that day, effective immediately.

70.    Mrs. Berkemeier filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission, alleging discrimination on the bases of race, color, religion, retaliation, and age.

71.    In February 2023, the consulting firm hired by the Museum released draft findings, which included the following statements:

> In the calm months preceding the start of the 2023 season, GCVM leadership has the opportunity, amplified by opening of a core management role, to make transformational change in the department and organization through new department leadership and realignment of the manager-level roles and responsibilities to better serve the needs of the department and museum in the months and years ahead.

> *    *    *

> The legacy staff that remains in the department is receptive to new ideas. They have expressed openness—excitement even—about assessing and rethinking how work is divided among manager positions and departments, cutting back and making more informed choices about program offerings, integrating new interpretive narratives, and implementing more robust staff training and evaluation protocols. Success in harnessing and directing this positive energy rests in the ability of the new department leader to build trust and gain the respect of legacy staff through transparency and advocacy on behalf of the department.

> *    *    *

> Get back to basics or try to. Part of the observation and assessment work of the new department leader can focus on working with the interpretation staff to clarify and define what the core functions of the interpretation team are. Based on my October 2022 conversation with the team, this thinking is already taking place, necessitated (and aided by) by vacant positions. In the interest of supporting the new strategic focus of the organization, programs should be evaluated based on how they advance the mission of the museum and align with the needs and interests of visitors (versus the personal interests of visitor-facing interpreters.)

> *    *    *

Bringing this new interpretive approach to fruition will require all involved to be comfortable with managing change over a multiyear timeline. The visitor-facing interpretive staff was described as "tradition bound" and many traditions will need to be broken during this process. While some staff will be excited about the changes, others will be fearful and this fear will need to be managed. The organization, from the board on down, must accept that this will be an extended period of disruption that will likely lead to some staff churn and perhaps public pushback. Success will require complete buy-in from the board and museum leadership.

\*        \*        \*

As discussed in the preceding section, the integration of new interpretive narratives will involve change over a multiyear timeline—including change to expectations for visitor-facing staff. There will likely be bumps in the road as legacy staff learn new historical content and engagement strategies and the organization recalibrates how much energy is focused on learning and demonstrating historic skills. This change will likely involve a significant culture shift within the department and organization that will need to be managed and may result in some long-term employees leaving or being asked to leave because of an inability or unwillingness to refocus their interpretive approach.

72.     The EEOC issued a right-to-sue letter on October 3, 2024, which is attached hereto as EXHIBIT A and incorporated as if fully set forth herein.

## CLAIMS

### COUNT I—VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
#### (Against the Museum and Ms. Wehle in her Official Capacity only)

73.     Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

74.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiff's right to free exercise of religion.

75.     The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, protects against "penalties on the free exercise of religion." *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022).

76.     The Free Exercise Clause prohibits the government from acting with hostility toward religious beliefs or practices, and it protects against both overt and covert discrimination based on religious status or beliefs. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

77.     Plaintiff holds the sincere religious belief that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that she is to follow its teachings.

78.     Plaintiff repeats and realleges herein the sincerely held religious beliefs explained in the preceding section of this Complaint.

79.     Plaintiff has the sincerely held religious belief, compelled by Scripture, that "to him that knoweth to do good, and doeth it not, to him it is sin." James 4:7 (KJV).

80.     Plaintiff also has the sincerely held religious belief, compelled by Scripture, that she is to "take no part in the unfruitful works of darkness," but to "expose them." Ephesians 5:11 (ESV).

81.     Plaintiff also has the sincerely held religious belief, compelled by Scripture, that silence in the face of evil is evil itself. *See* Proverbs 8:1-8 ("Doth wisdom not cry? And understanding put forth her voice . . . She crieth at the gates, at the entry of the city, at the coming in at the doors. . . . Hear, for I will speak excellent things; and the opening of my lips shall be right things. For my mouth speak truth; and wickedness is an abomination to my lips. All the words of my mouth are in righteousness; there is nothing froward or perverse in them." (KJV)).

82.    Plaintiff also has the sincerely held religious belief, compelled by Scripture, that she is to "open [her] mouth for the mute, for the rights of all who are destitute" and to "[o]pen [her] mouth" and "judge righteously." Proverbs 31:8-9 (ESV).

83.    Plaintiff also has the sincerely held religious belief, compelled by Scripture, that there is "a time to keep silence, and a time to speak," Ecclesiastes 3:7 (ESV), and that the time to speak is when that which she views as wrong is taking place in her presence.

84.    Plaintiff also has the sincerely held religious belief that for her to fail to speak out against things she knows are wrong results in the eternal condemnation of her soul. "If you say, 'behold, we did not know this,' does not he who weighs the heart perceive it? Does not he who keeps watch over your soul know it, and will he not repay man according to his work." Proverbs 24:12 (ESV).

85.    Plaintiff also has the sincerely held religious belief that she is to refrain from lying, bearing false witness, or participating in anything that is untruthful. Her beliefs are rooted in Scripture. *E.g.*, Exodus 20:16 (KJV) ("Thou shalt not bear false witness."); Proverbs 6:16-18 (KJV) ("There are six things the Lord hates . . . a lying tongue."); Proverbs 12:22 (NIV) ("The Lord detests lying lips."); Ephesians 4:29 (KJV) ("Let no corrupt communication proceed out of your mouth . . . . ").

86.    Defendants targeted Plaintiff on account of her sincerely held religious beliefs for disparate and discriminatory treatment because Defendants perceived those beliefs to be incompatible or in tension with Defendants' preferred worldview.

87.    Defendants' newly minted policies, implemented under the banner "DEAI," impermissibly burdened Plaintiff's sincerely held religious beliefs in that Defendants sought to compel Plaintiff to either change her beliefs or act in contradiction to them.

88.     Defendants sought to force Plaintiff to choose between the teachings and requirements of her sincerely held religious beliefs in the commands of Scripture and the Museum's imposed value system.

89.     When Plaintiff chose the compliance with her sincerely held religious convictions and beliefs, Defendants terminated her employment.

90.     Defendants placed Plaintiff in an irresolvable conflict between compliance with its policies and her sincerely held religious beliefs.

91.     Defendants' policies described herein, on their face and as applied, were neither neutral nor generally applicable.

92.     Defendants' policies described herein, on their face and as applied, specifically targeted Plaintiff's religious beliefs for disparate and discriminatory treatment.

93.     Defendants' policies described herein, on their face and as applied, specifically target religion for disparate and discriminatory treatment.

94.     Defendants' policies described herein, on their face and as applied, create a system of individualized exemptions for preferred value systems while discriminating against employees who hold certain sincere religious beliefs.

95.     Defendants' policies described herein, on their face and as applied, constitute a religious gerrymander by unconstitutionally orphaning sincerely held religious beliefs while permitting the more favored nonreligious value systems.

96.     Defendants' policies described herein, on their face and as applied, imposed a substantial burden on Plaintiff's exercise of her sincerely held religious beliefs during her tenure as a Museum employee and continue to so burden current and future Christian employees of the Museum.

97.    Defendants' policies described herein, on their face and as applied, fail to accommodate Plaintiff's sincerely held religious beliefs.

98.    Defendants' policies described herein are not supported by any compelling, legitimate, substantial, or even rational government interest.

99.    Defendants' policies described herein, on their face and as applied, are not the least restrictive means of achieving an otherwise permissible government interest.

100.    Plaintiff has no adequate remedy at law to protect against the continuing deprivation of her most cherished constitutional liberties and sincerely held religious beliefs.

101.    To the extent Defendants will contend that their conduct was necessitated and/or justified by the New York State Human Rights Law (NYS Exec Law § 296 *et seq*) as amended by GENDA (hereinafter referred to as "GENDA"), Plaintiff asserts that GENDA violates the Free Exercise Clause.

102.    Plaintiff has sincerely held religious beliefs, articulated more fully *supra* and incorporated herein, that are plainly and substantially burdened by GENDA.

103.    GENDA, on its face and as applied, targets Plaintiff's sincerely held religious beliefs for disparate and discriminatory treatment, solely on the basis of their religious nature.

104.    GENDA, on its face and as applied, impermissibly burdens Plaintiff's sincerely held religious beliefs, compels Plaintiff to either change those beliefs or act in contradiction to them, and forces Plaintiff to choose between the teachings and requirements of her sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

105.    GENDA, on its face and as applied, places Plaintiff in an irresolvable conflict between compliance with the Museum's discriminatory policies and her sincerely held religious beliefs.

106.    GENDA, on its face and as applied, puts substantial pressure on Plaintiff to violate her sincerely held religious beliefs.

107.    GENDA, on its face and as applied, is neither neutral nor generally applicable.

108.    GENDA, on its face and as applied, specifically targets Plaintiff's religious beliefs for disparate and discriminatory treatment.

109.    GENDA, on its face and as applied, creates a system of individualized exemptions for preferred value systems while discriminating against requests to accommodate sincerely held religious beliefs.

110.    GENDA, on its face and as applied, constitutes a religious gerrymander by unconstitutionally orphaning sincerely held religious beliefs while permitting the more favored nonreligious value systems.

111.    GENDA, on its face and as applied, fails to accommodate Plaintiff's sincerely held religious beliefs.

112.    GENDA, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

113.    GENDA, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

114.    GENDA, on its face and as applied, is irrational and unjustifiable, and imposes irrational restrictions on Plaintiff's sincerely held religious beliefs.

115.    Plaintiff has no adequate remedy at law to protect the continuing deprivation of her most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT II—VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (RETALIATION) (Against the Museum and Ms. Wehle in her Official Capacity only)**

116.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–73 above as if fully set forth herein.

117.    The Free Speech Clause of the First Amendment prohibits government retaliation against persons for engaging in constitutionally protected speech, expression, and conduct.

118.    Plaintiff engaged in constitutionally protected conduct by expressing and maintaining her sincerely held religious beliefs, including in her place of employment.

119.    Plaintiff also engaged in constitutionally protected speech and refused the Museum's attempt to compel speech contrary to her sincerely held religious beliefs.

120.    Plaintiff's respectful use of her co-worker's chosen/preferred first name rather than by a pronoun contrary to the co-worker's biological sex is protected speech and expression.

121.    Defendants, acting under the color of state law, retaliated against Plaintiff in the manner described hereinabove, which culminated in the termination of her employment.

122.    Defendants also retaliated against Plaintiff by besmirching her character to her former co-workers and Cheyney McKnight, who refuses to speak to Plaintiff as a result of being informed by Ms. Wehle, in sum and substance, that Plaintiff's employment with the Museum was terminated on account of being racist and/or otherwise bigoted in her views and actions.

123.    The termination of Plaintiff's employment, the hostile work environment she was subjected to prior to her termination, and the maligning of her reputation following the termination event were all retaliatory actions undertaken by Defendants in response to Plaintiff's speech and expression, rooted in her sincerely held religious beliefs.

124.     Defendants' investigation, discipline, harassment, termination, and slander of Plaintiff are actions that would chill and deter a person of ordinary firmness from exercising her constitutional rights to express or maintain her sincerely held religious beliefs and convictions.

125.     As a direct result of Defendants' retaliatory actions, Plaintiff has suffered substantial harm, including the loss of her income and reputational harm.

126.     A clear causal link exists between Plaintiff's religious expression and exercise, and Defendants' retaliatory termination of her employment.

127.     Defendants' termination of Plaintiff's employment was undertaken in bad faith and with the specific intent to punish and retaliate against Plaintiff for her sincerely held religious beliefs and expression, effectively punishing Plaintiff for engaging in constitutionally protected speech and expression.

128.     As a further result of Defendants' violation of the First Amendment, Plaintiff has suffered and will continue to suffer irreparable harm, including a chilling of her and other employees' constitutional right to free speech, and as such, Plaintiff is entitled to injunctive, declaratory, and monetary relief.

129.     Plaintiff has no other adequate remedy at law to protect against the deprivation of her cherished constitutional liberties and sincere religious beliefs.

130.     To the extent Defendants will contend that their retaliatory conduct was necessitated and/or justified by the New York State Human Rights Law (N.Y.S. Exec. Law. §296) as amended by GENDA (hereinafter referred to as "GENDA"), Plaintiff asserts that GENDA, on its face and as applied, is unconstitutional in that would chill and deter persons of ordinary firmness from exercising their constitutional right to express or maintain their religious beliefs.

131.    GENDA, on its face and as applied, unconstitutionally discriminates on the basis of viewpoint.

132.    GENDA, on its face and as applied, unconstitutionally discriminates on the basis of content.

133.    GENDA, on its face and as applied, singles out Plaintiff solely because of her religious beliefs and expression to be subjected her to investigation, discipline and termination solely on the basis of her religious beliefs and expression.

134.    GENDA, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

135.    GENDA, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

136.    GENDA, on its face and as applied, is not narrowly tailored to achieve any such legitimate interest, even if it existed.

137.    GENDA, on its face and as applied, lacks any rational basis and is irrational and unjustifiable.

138.    GENDA, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Christian employees in the State of New York and impermissibly burden the expression of their sincerely held religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT III—VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST
AMENDMENT TO THE UNITED STATES CONSTITUTION
(Against the Museum and Ms. Wehle in her Official Capacity only)**

139.     Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

140.     The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

141.     The Free Speech Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the state from excluding Plaintiff from government programs and positions based on her religion, and such "exclusion constitutes viewpoint discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001).

142.     Defendants' policies described hereinabove, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

143.     Through their policies described herein, on their face and as applied, Defendants acted to exclude Plaintiff from government employment solely due to her religious identity and the expression of her Bible-centered beliefs and viewpoint.

144.     Government efforts to punish speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

145.     Defendants' policies described herein, on their face and as applied, singled out Plaintiff because of her religious beliefs and expression, and subjected her to investigation, discipline, harassment, and termination solely on the basis of her religious beliefs and expression.

146.    Defendants' policies described herein, on their face and as applied, unconstitutionally discriminate on the basis of content.

147.    Defendants' policies described herein, on their face and as applied, also seek to compel speech, even when that compelled speech causes the speaker to violate the sincerely held tenets of his or her faith.

148.    Defendants' policies described herein, on their face and as applied, also constitute an impermissible prior restraint on speech in that speech not in conformity with the ideologies held by Defendants is banned in all contexts.

149.    Defendants' policies described herein are not supported by any compelling, legitimate, substantial, or even rational government interest.

150.    Defendants' policies described herein, on their face and as applied, are not the least restrictive means of achieving an otherwise permissible government interest.

151.    Defendants' policies described herein, on their face and as applied, are not narrowly tailored to achieve any such legitimate interest.

152.    Defendants' policies described herein, on their face and as applied, lack any rational basis.

153.    Defendants' policies described herein, on their face and as applied caused irreparable harm to Plaintiff and is causing and will continue to cause irreparable harm and actual and undue hardship on the ability of current and prospective employees' ability to express their sincerely held religious beliefs in the workplace and/or during the course of seeking employment with the Museum.

154.    To the extent Defendants will contend that their conduct was necessitated and/or justified by the New York State Human Rights Law (N.Y.S. Exec. Law §296) as amended by

GENDA (hereinafter referred to as "GENDA"), Plaintiff asserts that GENDA, on its face and as applied, is unconstitutional in that would chill and deter persons of ordinary firmness from exercising their constitutional right to express or maintain their religious beliefs.

155.    GENDA, on its face and as applied, unconstitutionally discriminates on the basis of viewpoint.

156.    GENDA, on its face and as applied, unconstitutionally discriminates on the basis of content.

157.    GENDA, on its face and as applied, singles out Plaintiff solely because of her religious beliefs and expression, and permitted the Museum subject her to investigation, discipline and termination solely on the basis of her religious beliefs and expression.

158.    GENDA, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

159.    GENDA, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

160.    GENDA, on its face and as applied, is not narrowly tailored to achieve any such legitimate interest, even if it existed.

161.    GENDA, on its face and as applied, lacks any rational basis and is irrational and unjustifiable.

162.    GENDA, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Christian employees in the State of New York and impermissibly burden the expression of their sincerely held religious beliefs.

163.    There exists no other adequate remedy at law to protect against the continuing deprivation of these most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT IV—VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
#### (Against the Museum and Ms. Wehle in her Official Capacity only)

164.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

165.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to equal protection under the law.

166.    "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

167.    The Equal Protection Clause prohibits discrimination on the basis of religion.

168.    Defendants' termination of Plaintiff on the basis of her sincerely held religious beliefs and expression violated the Equal Protection Clause.

169.    Defendants' termination of Plaintiff on the basis of her sincerely held religious beliefs and expression singled her out for selective, disparate, and discriminatory treatment.

170.    Defendants' termination of Plaintiff on the basis of her sincerely held religious beliefs and expression was explicitly intended to inhibit and punish the exercise of Plaintiff's sincerely held religious beliefs and expression.

171.    To the extent Defendants will contend that their conduct was necessitated and/or justified by the New York State Human Rights Law (N.Y.S. Exec. Law §296) as amended by GENDA (hereinafter referred to as "GENDA"), Plaintiff asserts that GENDA, on its face and as

applied, violates the Equal Protection Clause of the Fourteenth Amendment by discriminatorily treating Plaintiff dissimilarly to similarly situated employees solely on the basis of her sincerely held religious beliefs and expression.

172.    GENDA, on its face and as applied by Defendants, is an unconstitutional abridgment of Plaintiff's right to equal protection under the law, is not neutral, and specifically targets Plaintiff's sincerely held religious beliefs and expression for discriminatory and unequal treatment.

173.    GENDA, on its face and as applied by Defendants, is an unconstitutional abridgement of Plaintiff's right to equal protection because it permits Defendants to treat Plaintiff differently from other similarly situated Museum employees on the basis of Plaintiff's sincerely held religious beliefs and expression.

174.    GENDA, on its face and as applied by Defendants, singles out Plaintiff and other persons who hold fast to a Biblical worldview for selective and discriminatory treatment based upon their sincerely held religious beliefs and expression.

175.    GENDA, on its face and as applied by Defendants, is explicitly intended to inhibit and punish the exercise of Plaintiff's sincerely held religious beliefs and expression.

176.    GENDA, on its face and as applied, to the extent it affords preferential treatment and, in fact, dominance to the "right" of an individual to be called by his or her desired pronoun to the right of persons with sincere religious objection to speaking untruths, creates a system of classes and categories that permit the government (and other employers) to exclude persons with sincerely held religious beliefs, such as Plaintiff, from employment.

177.    GENDA, on its face and as applied, is a "status-based enactment divorced from any factual context" and "a classification of persons undertaken for its own sake," which "the Equal Protection Clause does not permit." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

178.    GENDA, on its face and as applied, results in a "disqualification of a class of persons from the right to seek specific protection." *Id.*

179.    GENDA, on its face and as applied, "declar[es] that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.*

180.    GENDA, on its face and as applied, "raises the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected," *Id.* at 634, and thus violates the Equal Protection Clause.

181.    GENDA, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

182.    GENDA, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

183.    GENDA, on its face and as applied, has caused Plaintiff to suffer irreparable harm, and is continuing to cause irreparable harm and actual and undue hardship on current Museum and other government employees with sincerely held religious beliefs similar to Plaintiff's.

184.    There exists no other adequate remedy at law to protect against the continuing deprivation of these most cherished constitutional liberties and expression of sincerely held religious beliefs

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT V—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42**
**U.S.C. § 2000e, *et seq.***
**(DISPARATE TREATMENT ON THE BASIS OF RELIGION)**
**(Against the Museum)**

185.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

186.    Title VII prohibits discrimination against employees on the basis of their religion. 42 U.S.C. §2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . .").

187.    Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

188.    The Museum is an employer within the meaning of Title VII and employs more than 15 employees.

189.    The Museum treated Plaintiff differently from its other employees because she is a devout Christian and requested accommodations based upon her sincerely held religious beliefs and convictions.

190.    Plaintiff has a bona fide and sincerely held religious belief against Defendants' employment requirements, as outlined above.

191.    Plaintiff informed Defendants of her sincerely held religious beliefs and convictions and of her desire to align her conduct to such beliefs and to obtain an accommodation for those beliefs.

192.    Defendants' disparate treatment on the basis of religion culminated in Defendant taking adverse employment action against Plaintiff and terminating her employment because it did

not agree with her religious beliefs or, stated differently, determined that her religious beliefs were incompatible with its own beliefs and employment requirements.

193.    By terminating Plaintiff's employment in the manner and for the reasons described hereinabove, Defendant discriminated against Plaintiff on account of her religion with respect to the terms, conditions, and privileges of employment in violation of Title VII.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT VI—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.* (FAILURE TO ACCOMMODATE) (Against the Museum)

194.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 and 187-196 above as if fully set forth herein.

195.    Title VII prohibits discrimination against employees on the basis of their religion. 42 U.S.C. §2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . . .").

196.    Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

197.    The Museum is an employer within the meaning of Title VII and employs more than 15 employees.

198.    Title VII requires employers to reasonably accommodate the religious beliefs and practices of its employees unless the employer is able to demonstrate that doing so would cause said employer to suffer undue hardship. *See, e.g.*, *Groff v. DeJoy*, 600 U.S. 447, 457 (2023).

199.   By refusing to even consider, much less grant, any religious accommodation or exemption to the Defendants' DEIA policies and other employment requirements, Defendants have discriminated against Plaintiff's sincerely held religious beliefs with respect to the terms, conditions, and privileges of employment.

200.   Plaintiff has a bona fide and sincerely held religious belief against Defendants' employment requirements, as outlined above.

201.   Plaintiff informed Defendants of her sincerely held religious beliefs and convictions and of her desire to align her conduct to such beliefs.

202.   Defendant consistently and repeatedly denied such accommodation to Plaintiff.

203.   Plaintiff was otherwise qualified for her employment with the Museum.

204.   Defendant has an unquestionable obligation to engage in an interactive accommodation process with Plaintiff concerning her sincerely held religious beliefs, the conflict between the religious beliefs and Defendants' employment requirements, and to attempt to reach an accommodation suitable for Plaintiff and consistent with the requirements of Title VII.

205.   Defendant failed to even engage in the required interactive process with Plaintiff or make any effort to arrive at a mutually agreeable accommodation.

206.   Defendant's termination and adverse employment actions against Plaintiff are the result of Plaintiff's exercise of her sincerely held religious beliefs and expression.

207.   Defendants' refusal to engage in the interactive accommodation process with Plaintiff was the result of Plaintiff's exercise of her sincerely held religious beliefs and expression.

208.   The adverse employment actions taken by Defendant against Plaintiff, including the denial of accommodation, have caused, are causing, and will continue to cause irreparable harm to Plaintiff including loss of income and reputational harm.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT VII—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.*
## (RETALIATION)
## (Against the Museum)

209.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

210.    Plaintiff has sincerely held religious beliefs, as outlined *supra* and incorporated herein, that conflicted with Defendants' policies and other employment requirements.

211.    Plaintiff made Defendants aware of her sincerely held religious beliefs and the conflict between her sincerely held religious beliefs and Defendants' employment requirements.

212.    Plaintiff sought reasonable accommodations from Defendants to resolve the conflict between her sincerely held religious beliefs and Defendants' policies and employment requirements.

213.    In retaliation for Plaintiff exercising her right afforded by Title VII to seek reasonable accommodation in light of the conflict between her sincerely held religious beliefs and some duties of her employment, Defendant subjected Plaintiff to adverse employment actions and a hostile work environment, including interrogation and harassment, disciplined her unjustly, terminated her employment, and besmirched her good name.

214.    Plaintiff suffered materially adverse employment action as a result of her sincerely held religious beliefs and accommodation requests.

215.    There is a direct and causal connection between Plaintiff's sincerely held religious beliefs, her request for those religious beliefs to be accommodated, and Defendants' adverse employment actions against Plaintiff.

216.    Defendants can articulate no legitimate or rational, non-discriminatory reason for the adverse employment actions undertaken against Plaintiff.

217.    Any rationale Defendants could articulate for the retaliatory and adverse employment actions against Plaintiff would, plainly, be pretextual.

218.    Defendants' retaliatory and adverse employment actions against Plaintiff for the exercise of her sincerely held religious beliefs and requests for accommodation would not have occurred in the absence of retaliatory motive.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT VIII—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e, *et seq.***
**(DISPARATE TREATMENT ON THE BASIS OF RACE AND COLOR)**
**(Against the Museum)**

219.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

220.    Although Defendants' greatest cause for disdain of Plaintiff was her sincerely held religious beliefs and expression and, more specifically, that her adherence to those beliefs caused her not to willingly subscribe to the worldview Defendants sought to impose upon her and her request for a reasonable accommodation from those policies and requirements, Defendants' also subjected Plaintiff to disparate treatment on account of her race and color.

221.    Title VII prohibits the discharge or the taking of other adverse employment on the basis of an individual's race, 42 U.S.C. §2000e-2(a)(1), and "[i]ts terms are not limited to discrimination against members of any particular race." *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976).

222.    Title VII's prohibition on race discrimination equally applies to "racial discrimination against whites on the same terms as racial discrimination against non-whites." *Id.*

223.    Defendants expressed preference for non-white employees.

224.    Plaintiff is a white employee, who did not fall into Defendants' preference for non-white employees.

225.    Plaintiff was otherwise qualified for the position she held for many years and otherwise performed satisfactorily.

226.    Plaintiff was terminated because she did not fall into the preferred racial category of Defendants.

227.    Plaintiff's expression of her sincerely held religious beliefs that race and color were irrelevant to her obligation to treat them equally and that all humans were part of the same race, created equally by God, and deserving of value and importance, did not comport with Defendants' racially focused policies and employment requirements.

228.    Plaintiff's sincerely held religious beliefs that compelled her to view all people as created by God in His image and equally deserving of respect did not comport with Defendants' newly minted program of requiring all employees to view white people as "born oppressors" and somehow undeserving of identical respect and treatment.

229.    Defendants found Plaintiff's religious beliefs and racial views as unsuitable for employment because of her race and color.

230.    Plaintiff's refusal to compromise her sincerely held religious convictions that all persons are equal and created by God are circumstances that plausibly give rise to the inference that Defendant terminated her on the basis of her whiteness.

231. This disparate treatment on the basis of race and color directly resulted in Defendant terminating Plaintiff's employment in that Defendant made room for a non-white employee by terminating Plaintiff's employment.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT IX—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.* (DISPARATE TREATMENT ON THE BASIS OF AGE) (Against the Museum)

232. Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

233. Although Defendants' greatest cause for disdain of Plaintiff was her religious beliefs and, more specifically, that her adherence to those beliefs caused her not to willingly subscribe to the worldview Defendants sought to impose upon her, Defendants' also subjected Plaintiff to disparate treatment on account of her age.

234. Plaintiff was otherwise qualified for her position and clearly satisfactorily performed in that position for several decades.

235. Plaintiff was terminated from her employment because of Defendants' desire to discharge all "legacy staff" who would not accept, adopt, and comply with the new DEAI policies.

236. Further, Defendant credited the allegations of younger employees over Plaintiff and unfairly subjected Plaintiff to discipline for alleged "bullying" on account of her age.

237. Defendant sought to limit Plaintiff in her interactions with other staff, thereby segregating her, while she remained employed by Defendant. Defendant did so on the basis of Plaintiff's age.

238.    Defendant also classified Plaintiff as "legacy staff" that would need to be forced into submission with the Museum's new interpretative approach or be separated from employment due to her advanced age.

239.    There is a direct and substantial causal connection between Defendants' desire to terminate all "legacy staff" (*i.e.*, older employees) and Defendants' termination of Plaintiff's decades-long employment at the Museum.

240.    Defendants took adverse employment action against Plaintiff on the basis of her age and membership in the so-called "legacy staff" class.

241.    But for Plaintiff's membership in the so-called "legacy staff" class and her age, Defendants would not have discharged her employment.

242.    Defendants openly expressed a desire to employ younger employees and seek after younger applicants.

243.    Defendant also caused Plaintiff to suffer reputational harm and undermined her supervisory authority among younger co-workers by inviting them to make exaggerated or altogether false complaints about Plaintiff.

244.    Defendants undertook all of the foregoing actions for the purpose of setting Plaintiff up for termination because of her advanced age.

245.    As a direct result of Defendants' conduct described herein, Plaintiff has suffered loss of income, reputational harm, and extreme emotional distress.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT X—VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.*
### (HOSTILE WORK ENVIRONMENT)
### (Against the Museum)

246.     Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

247.     Because of Plaintiff's strict adherence to her sincerely held religious beliefs and Christian faith, and on account of her race, color and age, Plaintiff was subjected to a hostile work environment.

248.     Specifically, Defendants fabricated allegations of misconduct against Plaintiff and subjected her to undeserved discipline, repeatedly denied or altogether ignored her need for reasonable accommodation on account of her sincerely held religious beliefs, subjected her to incessant questioning and interrogation about the nature of those beliefs, terminated her long-term and beloved employment, and slandered her to her co-workers and others.

249.     Defendants' actions against Plaintiff were severe, pervasive, and episodic.

250.     Defendants' treatment of Plaintiff was severely permeated with discriminatory intimidation, ridicule, and insult such that the terms of Plaintiff's employment was objectively hostile and abusive.

251.     Defendants' actions toward Plaintiff were sufficiently continuous and concerted to have altered the conditions of her working environment.

252.     Plaintiff subjectively perceived Defendants' treatment of her as hostile and abusive.

253.     As a direct result of Defendants' conduct described herein and her loss of income, Plaintiff has suffered extreme emotional distress.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT XI—VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT
(ADEA), 29 U.S.C. § 623.
(Against the Museum)**

254.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72 above as if fully set forth herein.

255.    The ADEA makes it an unlawful employment practice for an employer (in relevant part):

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age…

29 U.S.C. §623.

256.    The Museum is an 'employer' as defined by the ADEA.

257.    As it pertains to Plaintiff, Defendant violated the ADEA by terminating Plaintiff's employment on account of her age.

258.    Plaintiff was otherwise qualified for her position and satisfactorily performed in that position for several decades.

259.    Plaintiff was terminated from her employment because of Defendants' desire to discharge all "legacy staff" who would not accept, adopt, and comply with the new DEAI policies.

260.    Further, Defendant credited the allegations of younger employees over Plaintiff and unfairly subjected Plaintiff to discipline for alleged "bullying" on account of her age.

261.    Defendant sought to limit Plaintiff in her interactions with other staff, thereby segregating her, while she remained employed by Defendant. Defendant did so on the basis of Plaintiff's age.

262.   Defendant also classified Plaintiff as "legacy staff" that would need to be forced into submission with the Museum's new interpretative approach or be separated from employment due to her advanced age.

263.   Defendants' intentions behind the desire to rid the Museum of "legacy staff" was solely to terminate older employees in violation of the ADEA.

264.   There is a direct and substantial causal connection between Defendants' desire to terminate all "legacy staff" (*i.e.*, older employees) and Defendants' termination of Plaintiff's decades-long employment at the Museum.

265.   Defendants took adverse employment action against Plaintiff on the basis of her age and membership in the so-called "legacy staff" class.

266.   But for Plaintiff's membership in the so-called "legacy staff" class and her age, Defendants would not have discharged her employment.

267.   Defendants openly expressed a desire to employ younger employees and seek after younger applicants to replace so-called "legacy staff."

268.   Defendant also caused Plaintiff to suffer reputational harm and undermined her supervisory authority among younger co-workers by inviting them to make exaggerated or altogether false complaints about Plaintiff.

269.   Defendants undertook all of the foregoing actions for the purpose of setting Plaintiff up for termination because of her advanced age.

270.   As a direct result of Defendants' conduct described herein, Plaintiff has suffered loss of income, reputational harm, and extreme emotional distress.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT XII—VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. Exec. Law §296(1)**
**(Against All Defendants)**

271.    Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1–72, above as if fully set forth herein.

272.    The actions undertaken by Defendants against Plaintiff as alleged herein violate the New York State Human Rights Law ("NYSHRL").

273.    The standards of proof and review for violations the NYSHRL mirror Title VII. *See, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

274.    Plaintiff hereby specifically realleges and adopts the allegations of her Title VII claims, paragraphs 188-257, as if fully set forth herein.

275.    These actions violate the New York State Human Rights Law and caused Plaintiff to suffer financial, emotional, and reputational harm.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court issue a Permanent Injunction upon judgment, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with GENDA and other policies that purport to require denial of religious accommodation to it employees, and compelling Defendants to reasonably accommodate the religious beliefs and practices of its employees in accordance with the mandates of Title VII as elucidated by the United States Supreme Court in *Groff v. DeJoy*, 600 U.S. 447,

457 (2023), including, but not limited to, accommodating the religious beliefs of employees prohibited from their faith by uttering pronouns inconsistent with biological sex and from otherwise treating employees differently on the basis of their race or skin color;

      B.    That the Court render a declaratory judgment declaring that Defendants' treatment of Plaintiff during the course of her employment and its termination of her employment was unconstitutional and unlawful, and further declaring—

      (1)    that Defendants intentionally discriminated against Plaintiff's sincerely held religious beliefs and expression by terminating her on the basis of her request for accommodation;

      (2)    that Defendants intentionally and unlawfully discriminated against Plaintiff in violation of Title VII by refusing to engage in the interactive accommodation process;

      (3)    that Defendants intentionally and unlawfully discriminated against Plaintiff in violation of Title VII by retaliating against Plaintiff for requesting accommodation on the basis of her sincerely held religious beliefs;

      (4)    that Defendants intentionally and unlawfully discriminated against Plaintiff in violation of Title VII by subjecting Plaintiff to a discriminatory and hostile work environment and subjecting her to investigation, disciplinary proceedings, and segregation on the basis of her sincerely held religious beliefs;

      (5)    that Defendants intentionally and unlawfully discriminated against Plaintiff in violation of Title VII by discriminating against her on the basis of her status as a white employee;

(6)     that Defendants intentionally and unlawfully terminated Plaintiff in violation of the ADEA by discriminating against Plaintiff on the basis of her age and membership in the so-called "legacy staff" class; and

(7)     that Defendants intentionally and unlawfully terminated Plaintiff in violation of the New York State Human Rights Law by discriminating against Plaintiff on the basis of her sincerely held religious beliefs.

C.     That the Court render a declaratory judgment declaring that GENDA, both on its face and as applied by Defendants, is illegal and unlawful in that it purports to remove federal civil rights and constitutional protections from Plaintiff and other employees of the Genesee Country Village & Museum, and further declaring—

(1)     GENDA, both on its face and as applied, violates the First Amendment to the United States Constitution by specifically targeting Plaintiff's sincerely held religious beliefs for disparate and discriminatory treatment;

(2)     GENDA, both on its face and as applied, violates the First Amendment to the United States Constitution by singling out Plaintiff's religious viewpoint, content, and expression for discriminatory treatment;

(3)     GENDA, both on its face and as applied, violates the First Amendment to the United States Constitution by attempting to compel speech that violates the speaker's sincerely held religious beliefs and conscience;

(4)     GENDA, both on its face and as applied, violates the First Amendment to the United States Constitution in that it constitutes a prior restraint on speech borne out of sincerely held religious beliefs; and

(5)    GENDA, both on its face and as applied, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by codifying into law a preference for the "right" of a person to be addressed by his/her/their preferred pronoun over and above the fundamental right of persons not to be compelled by the government to utter speech or otherwise act in a manner contrary to their his/her/their sincerely held religious beliefs or the dictates of his/her/their conscience;

D.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.    That the Court restore Plaintiff to the *status quo ante* – that is, reinstate Plaintiff to her prior position of employment and restore all benefits appurtenant thereto;

F.    That the Court award Plaintiff backpay and other actual damages in an amount to be determined at trial;

G.    That the Court award Plaintiffs their reasonable attorney's fees, costs, and other expenses and disbursements in this action 42 U.S.C. § 1988, and as otherwise allowed by law;

H.    That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

I.    That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully Submitted,

LIBERTY COUNSEL

By: _____/S/_____

Kristina S. Heuser, Esq.
Mathew D. Staver, Esq.*
Horatio G. Mihet, Esq.*
Daniel G. Schmid, Esq.*
*Attorneys for Plaintiff*
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Emails: kheuser@lc.org
       hmihet@lc.org
       dschmid@lc.org
       court@lc.org
*Seeking admission *pro hac vice*